## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Janice Marie Stevenson, | Case No. 5:20CV2688 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| | Magistrate Judge Jennifer D. Armstrong |
| Kilolo Kijakazi, | |
| Acting Commissioner of Social | |
| Security, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Plaintiff Janice Marie Stevenson ("Plaintiff" or "Stevenson") challenges the final decision of Defendant Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq*. ("Act").  For the reasons set forth below, the Commissioner's final decision is VACATED and this matter is REMANDED pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion.

## I.     Procedural History

In September 2018, Stevenson filed applications for POD and DIB, alleging a disability onset date of April 18, 2018 and claiming she was disabled due to psoriatic arthritis, shoulder impingement syndrome, osteoarthritis, trigger finger - right thumb, and De Quervain's tenosynovitis. (Transcript ("Tr.") 15, 80, 101.) The applications were denied initially and upon reconsideration, and Stevenson requested a hearing before an administrative law judge ("ALJ").  (Tr. at 15, 79-98, 100-116, 129.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On January 21, 2020, an ALJ held a hearing, during which Stevenson, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 29-60.)  On March 10, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 15-24.) The ALJ's decision became final on September 28, 2020, when the Appeals Council declined further review. (Tr. 1-7.)

On December 2, 2020, Stevenson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 16, 19, 20.) Stevenson asserts the following assignment of error:

1. The ALJ's RFC determination is unsupported by substantial evidence as he relied on the stale opinions of the State Agency medical consultants and inserted his own lay medical opinion.

(Doc. No. 16.)

## II.    Evidence

### A.    Personal and Vocational Evidence

Stevenson was born in June 1970 and was 49 years-old at the time of her administrative hearing (Tr. 33-34, 183), making her a "younger" person under Social Security regulations.[2] 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education, completed four or more years of college, and is able to communicate in English.  (Tr. 34, 213.)  She has past relevant work as a tax professional, substitute teacher, and nonprofit organization counsel registrar. (Tr. 213.)

### B.    Relevant Medical Evidence[3]

---

[2] The regulations provide as follows: "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 404.1563(c).

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

#### 1.      Evidence pre-dating the State Agency Medical Opinions

Stevenson was involved in a motorcycle accident at some point in 2016 and subsequently underwent right shoulder surgery.  (Tr. 285.)  On January 12, 2018, she presented to Gamaliel Batalla, M.D., with complaints of continued right shoulder pain.  (*Id*.)  Stevenson also complained of weakness in her biceps and shoulders, and numbness in her right fingers.  (*Id*.)  An EMG of her right upper extremity was normal.  (Tr. 285, 307.)  Stevenson stated that her pain was worse with lifting, moving, and wearing tight clothing and that physical therapy had not helped "a bit." (Tr. 285.)  On examination, Dr. Batalla noted right shoulder tenderness as well as limited abduction and increased pain on range of motion of the right shoulder.  (Tr. 286.)  Stevenson's motor strength was 5/5 in all extremities except her right upper extremity strength was 4+/5.  (*Id*.)  Dr. Batalla assessed shoulder degenerative joint disease, and prescribed Robaxin and a TENS unit.  (*Id*.)

On February 5, 2018, Stevenson presented to the emergency department for evaluation of her right thumb after falling on the ice.  (Tr. 322.)  She complained of pain in her right thumb, right shoulder, and bilateral knees.  (*Id*.)  She rated her pain a 9 on a scale of 10 and stated that she was left hand dominant.  (*Id*.)  An x-ray of Stevenson's right shoulder showed (1) persistent widening of the coracoclavicular distance likely related to prior coracoclavicular ligamentous injury; (2) interval distal right clavicle resection; (3) posttraumatic ossifications near the coracoid process; and (4) no definite fracture.  (Tr. 324.)  X-rays of Stevenson's right hand and wrist showed a scaphoid fracture. (*Id*.) Stevenson was placed in a wrist splint and discharged in stable condition.  (Tr. 324-325.)

Shortly thereafter, on February 14, 2018, Stevenson presented to Steven Coss, M.D., for evaluation of her right hand.  (Tr. 331-334.)  She complained of swelling in her right hand and numbness/tingling in the fingers of her right hand.  (Tr. 331.)  Physical examination of her right wrist

3

and hand was normal.  (Tr. 332.)  Dr. Coss assessed a scaphoid fracture of the right wrist and a right forearm sprain.  (Tr. 333.)  He prescribed Ultram (also known as Tramadol) and applied a thumb-spica cast.  (*Id*.)  Dr. Coss recommended that Stevenson be placed in a short arm cast for six weeks and that she be restricted from lifting and "heavy gripping" with her right hand.  (*Id*.)

Stevenson returned to Dr. Coss on March 28, 2018 for a recheck of her right hand.  (Tr. 335.) She complained of constant, throbbing pain in her right hand, and numbness/tingling in her right thumb.  (*Id*.)  Physical examination revealed normal pulse, normal palpation, full range of motion without pain, intact "motors," and normal sensation.  (Tr. 336.)  Dr. Coss removed Stevenson's cast and applied a right wrist – thumb brace.  (Tr. 335, 337.)  He advised Stevenson that she would have some discomfort due to tendonitis and that he wanted her to start occupational therapy. (Tr. 337.)

On May 2, 2018, Stevenson presented to Dr. Coss for evaluation of new right knee pain.  (Tr. 339-341.)  She reported that she had had a knee replacement years earlier, in 2005.  (Tr. 339.) Stevenson stated that she had experienced anterior knee pain for awhile but that it had been worsening over the previous few weeks.  (*Id*.)  She also stated that her right knee would "catch" at times and that she had "tightness."  (*Id*.)  Examination revealed normal gait and station, negative Homan's sign, normal pulses, normal color, and normal light touch sensation, but tenderness in the medial patella and trace effusion in her knee joint.  (Tr. 340.)  X-rays of her right knee showed "good alignment" and "no loosening."  (Tr. 341.)  However, Dr. Coss noted that the imaging showed "a little overgrowth of bone … to the outer side of the patella."  (*Id*.)  He recommended conditioning exercises and a bone scan.  (*Id*.)

A week later, on May 9, 2018, Stevenson returned to Dr. Coss for a recheck of her right thumb.  (Tr. 345-347.)  She presented wearing a brace and stated that she did not feel that her thumb

4

was getting better.  (Tr. 345.)  She rated her pain a 5 to 6 on a scale of 10 but denied any numbness or tingling.  (*Id*.)  Examination was normal aside from moderate tenderness in her right thumb and moderate Finkelstein's test.  (Tr. 346.)  Dr. Coss assessed De Quervain's syndrome; nondisplaced fracture of the middle third of the scaphoid bone of the right wrist; and strain of flexor muscle, fascia, and tendon of the right thumb.  (Tr. 347.)  Dr. Coss explained that Stevenson's ligament and fracture were stable but that she was developing De Quervain's "and is tender over the MP joint sprain."  (*Id*.) Dr. Coss administered a cortisone injection to her thumb and advised her to continue occupational therapy.  (*Id*.)  He advised her that she can "come out of the brace a few times a day" and suggested that, if there was no improvement, she would need to undergo release surgery.  (*Id*.)

Stevenson underwent a whole-body bone scan on May 22, 2018 which showed (1) minimal increased blood flow to the area of the right patella; (2) mildly increased activity in the area of the right patellofemoral joint and diminished uptake related to the right total knee prosthesis; (3) subtle increased activity throughout the right patella; and (4) mildly increased activity in the bilateral first metatarsal phalangeal joints and in the right thumb.  (Tr. 348.)  The report indicates that these findings were nonspecific and "could indicate a mild degree of inflammation, stress reaction, or in early patellar component loosening."  (*Id*.)

On June 6, 2018, Stevenson returned to Dr. Coss for follow-up regarding her right knee.  (Tr. 350-352.)  She stated that she had been altering her gait to compensate for her right knee and that this was affecting her hip.  (Tr. 350.)  Examination revealed normal gait and station, negative Homan's sign, normal pulses, normal light touch sensation, and normal color, but moderate tenderness and trace effusion in her knee joint, positive Clarke sign (patellar grind test) and "positive anterior drawer test 15 mm" in her tibial femoral joint.  (Tr. 351.)  Dr. Coss assessed chronic instability of the right

knee, and right knee pain.  (Tr. 352.)  He explained that Stevenson's body scan was not clear but could show bone bruising inflammation in soft tissue, component loosening, damaged blood supply to the patella, or a possible infection.  (*Id*.)  Dr. Coss felt that she had mid-range instability and recommended she obtain a second opinion regarding the potential need for revision surgery.  (*Id*.)  He also provided Stevenson with a knee stabilizer brace.  (*Id*.)

On June 13, 2018, Stevenson presented to Dean Marshall, D.O., for a second opinion regarding her right knee.  (Tr. 356-359.)  She complained of right knee pain and numbness/tingling in her right foot and toes.  (Tr. 356.)  On physical examination of her hip and thighs, Dr. Marshall noted moderate to severe tenderness and moderately limited range of motion.  (Tr. 357.)  Examination of her knee and lower leg showed moderate tenderness, trace effusion and positive Clarke Sign.  (*Id*.)  All other physical examination findings were normal.  (*Id*.)  Stevenson underwent x-rays of her right hip, which showed "good alignment and no signs of loosening."  (Tr. 358.)  Dr. Marshall assessed chronic instability of the right knee; right knee pain; infection and inflammatory reaction due to internal orthopedic prosthetic device; and osteoarthritis in her bilateral hips.  (*Id*.)  Dr. Marshall ordered blood work to check for infection and prescribed a right hip injection. (Tr. 338-359.)  Stevenson underwent the hip injection on July 3, 2018.  (Tr. 363.)

Meanwhile, Stevenson returned to Dr. Coss on June 20, 2018 for evaluation of her right wrist.  (Tr. 360-362.)  She complained of pain in her entire wrist and thumb area.  (Tr. 360.)  She stated that her "right arm is entirely useless" and that she has no strength and cannot lift and move her finger to use a mouse on her computer.  (*Id*.)  On examination, Dr. Coss noted tenderness in her right wrist and right thumb, significant weakness, mild Finkelstein's test, and reduced grip and pinch strength (+1/5).  (Tr. 361.)  Dr. Coss also noted that Stevenson "can barely grip or squeeze my hand upon examination

today."  (Tr. 362.)  He recommended that she get an MRI of her right upper extremity and that she visit Ajay Seth, M.D., for a second opinion. (*Id*.)

Stevenson presented to Dr. Seth on July 9, 2018.  (Tr. 365-367.)  She stated that the "pain is getting worse despite all treatment" and further complained of occasional numbness in her fingers and "locking" of her thumb.  (Tr. 365.)  On examination, Dr. Seth noted a mild limp; normal station; normal range of motion, muscle strength, tone, and stability in her right elbow and forearm; tenderness and "improved pain" in her wrist and hand; and mild to moderate pain in her thumb with "locking felt and seen of the digit."  (Tr. 366.)  Dr. Seth assessed stable De Quervain's tenosynovitis and right thumb trigger finger.  (Tr. 367.) He did not feel that an MRI was warranted but did recommend that she obtain an additional "allowance" for her trigger thumb.  (*Id*.)

On July 11, 2018, Stevenson presented to Julie Mark, M.D., for evaluation of her psoriasis. (Tr. 385-388.)  She complained of severe itching at times, as well as joint pain in her ankle, knees, hips, and shoulders.  (Tr. 385.)  Dr. Mark noted that Stevenson had significant skin disease and significant joint pain. (Tr. 387.)  She assessed psoriasis and psoriatic arthritis.  (*Id*.)

Stevenson returned to Dr. Seth on July 19, 2018 for a cortisone injection in her right wrist. (Tr. 368-371.)  She complained of numbness/tingling in her right fingertips and "no strength" in her right arm.  (Tr. 368.)  Examination revealed a mild limp, and tenderness in her right wrist, hand, and thumb.  (Tr. 369.)  Dr. Seth administered a right wrist injection and advised to her to wear a splint. (Tr. 370.)

On August 13, 2018, Stevenson returned to Dr. Marshall for evaluation of her right hip and knee.  (Tr. 372-329.)  She reported no relief after her July 2018 hip injection, "not even for an hour." (Tr. 372.)  She complained of constant pain, as well as numbness and tingling in her toes.  (*Id*.)  On

examination, Dr. Marshall noted moderate to severe tenderness and moderately limited range of motion in her hip and thigh; and moderate tenderness, trace effusion, and positive Clarke sign in her right knee.  (Tr. 328.)  All other examination findings were normal. (*Id*.)  Dr. Marshall noted as follows: "Since the patient did not experience any relief from the cortisone injection to her right hip, I recommend proceeding with marcaine injection to her right knee today to see how much this helps with her pain.  If the injection helps significantly with her pain, then this means that her pain is coming from inside the knee joint.  If the injection does not help at all, then her pain is coming from outside of her knee." (Tr. 329.)  Stevenson underwent a right knee injection that day. (*Id*.)

On September 13, 2018, Stevenson returned to Dr. Seth for a follow up regarding her right thumb and wrist.  (Tr. 373-375.)  She reported that the right wrist injection "did not help at all, not even for a day or so." (Tr. 373.)  Stevenson complained of constant pain (which she rated an 8 on a scale of 10) and intermittent numbness/tingling in her right fingertips.  (*Id*.)  She also stated that she "cannot move her thumb." (*Id*.)  Dr. Seth continued Stevenson on her medications and administered an injection to her right thumb.  (Tr. 375.)

Stevenson presented to Dr. Marshall on September 17, 2018 for follow up regarding her right knee.  (Tr. 376-378.)  She reported that her previous knee injection had only provided relief for two hours.  (Tr. 376.)  She also complained of pain in her left knee.  (*Id*.)  Examination findings were normal except for moderate tenderness and trace effusion in her right knee and positive Clarke sign. (Tr. 377.)  Dr. Marshall discussed with her the risks and complications of revision surgery on her right knee.  (Tr. 378.)  He explained that he thought she was having a "stress reaction" and could not guarantee that surgical evaluation would make the problem any better.  (*Id*.)  Dr. Marshall further

8

stated that he believed Stevenson could "live with her implant the way it is" but that, if she can no longer live with the pain, then he would recommend surgery.  (*Id*.)

On October 18, 2018, Stevenson returned to Dr. Seth for consultation regarding her right thumb.  (Tr. 413-416.)  She reported that the injection did not help at all, the pain was getting worse, and that she could not hold a coffee cup or open doors.  (Tr. 413.)  On examination, Dr. Seth noted severe tenderness in Stevenson's right wrist and hand, moderate swelling in her right wrist, and severe Finkelstein's test.  (Tr. 414.)  Dr. Seth recommended that Stevenson undergo right thumb release surgery.  (Tr. 415.)

Stevenson underwent the surgery on October 29, 2018.  (Tr. 419.)  She returned to Dr. Seth in November and December 2018 for follow-up.  (Tr. 417-418, 434-435.)  On November 8, 2018, Stevenson stated that "overall" she was doing well and that her hand felt better after she came out of the splint.  (Tr. 418.)  Dr. Seth referred her to occupational therapy and told her not to lift or carry heavy objects and "only work on light activity through therapy."  (*Id*.)  On December 6, 2018, Stevenson reported "quite a bit of pain."  (Tr. 435.)  Dr. Seth noted that Stevenson's "grip strength is 3 lbs on the right (no effort given) and 45 lbs on the left hand."  (*Id*.)  He remarked that "we are not sure why she is not able to use a mouse or type, or use her hand to drive, we've never really heard of someone not being able to use their hand to hold a mouse or keyboard."  (*Id*.)  However, since she stated she could not hold a steering wheel, Dr. Seth advised her that it was not safe for her to drive and recommended that she not drive until after being evaluated at her next visit.  (*Id*.)

On January 3, 2019, Stevenson returned to Dr. Seth and reported that her right wrist/thumb pain was present at all times.  (Tr. 436.)  She stated that she could not grip anything and had no strength in her right arm.  (*Id*.)  On examination, Dr. Seth noted tenderness and mild swelling in her

right wrist and hand, and abnormal grip strength.  (Tr. 437.)  He also stated that "all motions cause her pain."  (*Id.*)  X-rays were taken of Stevenson's wrist, which were normal.  (Tr. 438.)  Dr. Seth advised Stevenson to continue occupational therapy and ordered a CT scan.  (*Id.*)  Stevenson underwent the CT scan on January 16, 2019, which showed degenerative changes of the radiocarpal joints and the carpometacarpal joints.  (Tr. 457.)  Stevenson returned to Dr. Seth on January 29, 2019 to discuss the results of the CT scan.  (Tr. 454-456.)  Dr. Seth felt that "her symptoms are coming from arthritis about her wrist that was pre-existing and aggravated" by her February 2018 injury.  (Tr. 456.)

On March 4, 2019, Stevenson returned to Dr. Marks for treatment of her psoriasis.  (Tr. 773-777.)  Stevenson was experiencing psoriatic flares at this time and complained of severe joint pain, stating "I am miserable."  (Tr. 773.)  Dr. Marks noted that Stevenson walked "as if in pain" and that her joint pain was significantly worse despite medication.  (Tr. 775-776.)  Dr. Marks felt that Stevenson's joint pain was due to psoriatic arthritis and started her on methotrexate.  (Tr. 776.)

## 2. Evidence post-dating the State Agency Medical Opinions

Stevenson returned to Dr. Seth on May 21, 2019 for follow-up regarding her right wrist.  (Tr. 903-905.)  Dr. Seth noted that she had good range of motion of her wrist with moderate pain.  (Tr. 903.)  He administered an injection, placed her in a wrist brace, and advised her that she was cleared to drive.  (Tr. 905.)

On July 10, 2019, Stevenson underwent bilateral knee x-rays, which revealed (1) increased bone prosthesis interface of the femoral component centrally distally at greatest 2mm; (2) mild soft tissue swelling of the right knee; (3) mild medial compartment narrowing of the left knee joint; (4)

10

faint left meniscal calcifications; (5) small bilateral knee joint effusions; and (6) an ossicle anterior to the distal left patellar tendon which may represent enthesopathy.  (Tr. 787.)

On July 17, 2019, Stevenson transferred care to the Veterans Administration ("VA") for treatment of her psoriasis.  (Tr. 871.)  She was evaluated by rheumatology which "did a thorough review of [her] outside chart and their evaluation did not show evidence of inflammatory arthritis." (*Id*.)  They recommended continuing Stevenson on methotrexate only if it improved her symptoms and referred her for a pain psychology assessment due to "slight concern for opioid-seeking behaviors."  (Tr. 871, 882.)

On August 6, 2019, Stevenson presented for a physical therapy consultation for her left knee and lower back pain.  (Tr. 895-899.)  Stevenson reported that her left knee had "gotten worn out from the years of compensating," and stated that her pain was constant and worse with all weight bearing activities. (Tr. 896.) She also complained of constant lower back pain. (*Id*.) X-rays of Stevenson's lumbar spine showed mild degenerative changes at the facet joint at L3-L4 and L4-L5.  (*Id*.) Examination revealed antalgic gait; 3/5 strength in Stevenson's right lower extremity; 4+/5 strength in her left hip; and normal range of motion in her hip and left knee but reduced range of motion in her right knee.  (Tr. 898.)  Physical therapist Jacquelin Moughiman found that the imaging and examination results were consistent with Patellofemoral Pain Syndrome ("PFPS") and mild medial joint osteoarthritis. (Tr. 899.) She rated Stevenson's rehab potential as "poor due to chronicity." (*Id*.)

On August 23, 2019, Stevenson underwent an EMG of her right upper extremity, which was abnormal. (Tr. 922.) Specifically, this study found electrodiagnostic evidence to suggest a right median mononeuropathy proximal to the takeoff of the flexor policis longus.  (*Id*.)

On September 16, 2019, Stevenson presented to clinical psychologist Emily K. Schroeder for a pain psychology assessment.  (Tr. 882-885.)  Stevenson complained of lower back pain with radiculopathy down the right side, bilateral knee and ankle pain, right worse than left. (Tr. 883.)  She stated that her pain impacted her mobility, mood, and concentration. (*Id.*)  Stevenson also stated that she engaged in minimal daily activity but was mostly independent in her activities of daily living (aside from some difficulty dressing herself).  (Tr. 884.)  Dr. Schroeder noted that Stevenson did not request medication during her appointment and denied any significant symptoms of depression or anxiety.  (Tr. 885.)

On September 26, 2019, Stevenson presented to Elias Veizi, M.D., for a pain consultation. (Tr. 876-881.)  She complained of pain in her lower back, bilateral knees, right lower extremity, and bilateral ankles, and stated that her pain had significantly affected her mobility and sleep quality. (Tr. 877.)  On examination, Dr. Veizi noted mildly antalgic gait, tenderness to her lumbar spine on palpation, and minimal limitations to her spinal range of motion.  (Tr. 878-879.)  Dr. Veizi felt that there was an underlying mental health component to her pain complaints and advised to her to follow up with pain psychology.  (Tr. 879.)  He also referred her to restorative physical therapy to strengthen her knees and for her "degenerative disc disease and L-spine lumbar spondylosis." (*Id.*)

The following day, Stevenson underwent an MRI of her cervical spine, which is difficult to read but appears to show "scattered mild cervical spondylosis, most pronounced at C5-6." (Tr. 923.)

On October 1, 2019, Stevenson presented to the emergency department after she injured her right knee while shopping at the grocery store.  (Tr. 874, 913.)  She called Rebecca Chucanis, R.N., the next day and reported that she had hyperextended her knee and it was swollen and painful.  (Tr. 874.)  Stevenson presented to Dr. Marshall on October 9, 2019.  (Tr. 913-915.)  At that time, she was

12

wearing a knee immobilizer and using crutches.  (Tr. 913.)  On examination, Dr. Marshall noted mild antalgic gait; moderate tenderness, swelling, instability, and crepitation in her right knee; and tenderness, effusion, and crepitation in her left knee.  (Tr. 914.)  He recommended a hinged knee brace and advised her to continue with physical therapy.  (Tr. 915.)  Dr. Marshall also noted that "if she continues with pain and instability, then [he] would recommend possibly surgery for revising the knee."  (*Id.*)

On October 15, 2019, Stevenson returned to Dr. Seth with complaints of constant pain and numbness/tingling in her right fingers.  (Tr. 916-918.)  Dr. Seth noted that the MRI of Stevenson's cervical spine was normal.  (Tr. 918.)  He recommended physical therapy for her right thumb.  (*Id.*)

The following day, Stevenson returned to dermatologist Dr. Khan.  (Tr. 871-873.)  She reported improvement in her psoriatic flares but stated that her joint pain was constant.  (Tr. 871.)  Dr. Khan continued Stevenson on Enbrel and reduced her methotrexate dosage.  (Tr. 872.)  He also assessed iron deficiency anemia and advised her to follow up with her primary care physician for evaluation and iron replacement therapy.  (*Id.*)

On November 14, 2019, Stevenson returned to Dr. Seth for follow-up regarding her right wrist and thumb.  (Tr. 919-921.)  She reported pain "mid-forearm all the way to the fingertips," as well as numbness/tingling "throughout."  (Tr. 919.)  Dr. Seth noted that "we are in the process of getting her median nerve neuropathy approved through [the Bureau of Workers Compensation]."  (Tr. 921.)

On December 20, 2019, Stevenson underwent pre-operative x-rays of her bilateral knees and lower extremities.  (Tr. 932.)  This imaging showed (1) mild medial compartment narrowing of the left knee; (2) preserved hip joints; (3) osteopenic bones; and (4) a small right-sided joint effusion. (*Id.*)

13

### C.    State Agency Reports[4]

On February 1, 2019, Leslie Green, M.D., opined that Stevenson could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for about six (6) hours in an eight-hour workday; and sit for about six (6) hours in an eight-hour workday.  (Tr. 92.)  Dr. Green further opined that Stevenson could occasionally (1) push/pull and operate foot controls with her right lower extremity; (2) climb ramps/stairs, and (3) balance, stoop, kneel, crouch, and crawl.  (Tr. 92-93.)  He found she could never climb ladders, ropes, or scaffolds.  (Tr. 93.)  Dr. Green further found that Stevenson was limited to frequent reaching with the right upper extremity in all directions; occasional reaching overhead with the right upper extremity; and frequent handling and fingering with her right hand.  (Tr. 93-94.)  Lastly, Dr. Green opined that Stevenson should (1) avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and vibration; and (2) avoid all exposure to hazards, including unprotected heights, hazards, and commercial driving.  (Tr. 94.)

On April 15, 2019, on reconsideration, Mehr Siddiqui, M.D., affirmed Dr. Green's findings with the exception that he found Stevenson could have unlimited exposure to vibration.  (Tr. 110-112.)

### D.    Hearing Testimony

During the January 21, 2020 hearing, Stevenson testified to the following:

---

[4] The Court notes that consultative examiner Robert F. Dallara, Jr., Ph.D., conducted a psychological evaluation of Stevenson's mental impairments and limitations on January 15, 2019. (Tr. 427-431.)  In addition, state agency psychological consultants Arcelis Rivera, Psy.D. and Cindy Matyi, Ph.D., evaluated Stevenson's mental functional limitations at the initial and reconsideration levels on January 19 and April 19, 2019, respectively.  (Tr. 89-90, 107-108.)  As Stevenson does not argue that the ALJ failed to properly evaluate the medical or opinion evidence relating to her mental impairments, the Court will not recount these state agency opinions herein.

- She lives with her husband, 19 year old son, and mother. (Tr. 34.) Her husband is disabled due to problems with his knees and back. (Tr. 42.) She has a driver's license; however, she does not drive because her doctor told her not to because of her arm and hand problems. (Tr. 34, 45.)

- She graduated from high school. (Tr. 34.) She last worked twenty to forty hours per week as a tax preparer. (Tr. 36.) She stopped working in February 2019 because of the mental strain and because the office was not handicap accessible. (*Id*.)

- She cannot work due to mononeuropathy in her right arm and hand; deteriorated bone in her knee; and pain in her shoulders, hips, knees, ankles and feet. (Tr. 36.) She suffers from constant joint pain and swelling in her knees, right wrist, and feet. (Tr. 36, 48.) She also experiences constant numbness in her right-hand fingers. (Tr. 48.) She also suffers from anemia and psoriasis. (Tr. 40-41.) Her anemia causes fatigue. (*Id*.) She experiences periodic flares of her psoriasis, which is "moderately controlled." (*Id*.) Cold and humidity make her condition worse. (*Id*.)

- She experiences headaches 5 to 6 times per week, some of which last all day. (Tr. 49.) She feels nauseous 3 to 4 days per week. (Tr. 43.)

- She takes several medications for her impairments, which bring her pain down to a 5 to 6 on a scale of 10. (Tr. 36.) However, she suffers numerous side effects, including nausea, fatigue, and "brain fog." (Tr. 34-35, 50.)

- She is unable to stand for more than twenty minutes before experiencing unbearable pain. (Tr. 37.) She can sit for thirty minutes but then needs to stand and move. (Tr. 38.) She can lift 2 to 3 pounds with both hands but cannot lift anything single handed. (*Id*.) She needs to lie down and elevate her legs five to six times per day. (Tr. 48-49.)

- She had an accident involving her right hand in February 2018 and underwent surgery in October 2018. (Tr. 39-40.) She has been wearing a splint since her surgery. (*Id*.) She cannot turn doorknobs, use a faucet, cut with a knife, use scissors, or reach or hold on to things with her right hand. (Tr. 39.) She cannot hold a computer mouse correctly or type because of splint and her neuropathy. (Tr. 45-46.) Zippers are a "great burden" and she needs help with buttons. (Tr. 48.) She is ambidextrous but the only thing she can do with her left hand is hold a pen, pencil, and fork. (Tr. 38.)

- Her pain interferes with her sleep. (Tr. 40.) She usually sleeps two and a half hours per night, wakes up, and then takes another several hours to fall back asleep. (*Id*.) She lies down mid-day to rest due to her fatigue. (Tr. 40-41.)

- On a bad day, she stays in her room by herself all day because of her pain, lack of energy, and nausea. (Tr. 43.) On a good day, she can go down the steps to the first floor. (Tr. 43.) She has more bad days than good days. (*Id*.)

15

- Her husband cooks 90% of the time. (Tr. 44-45.) She does laundry one day per week, but it takes her twice as long as it used to. (*Id*.) Her husband takes her everywhere she needs to go, including shopping and doctor appointments. (Tr. 46.) She installed a walk-in shower and a chair in her tub, to assist with bathing. (Tr. 47.) She also has a special attachment to her phone that allows her to balance it in her hands and use it. (*Id*.)

The ALJ asked the VE to "focus on" Stevenson's past relevant work ("PRW") as a registrar/data entry clerk.[5] (Tr. 52.) The ALJ then posed the following hypothetical question to the vocational expert ("VE"):

> For these hypotheticals, consider a younger individual born in June of 1972 [sic] with a high school education under the regulations. The first question, Mr. Salkin, consider an individual that can lift, carry, push, and pull 20 pounds occasionally and 10 frequently. For this hypothetical, the individual can sit for six hours, stand and/or walk for six hours in a normal workday. This person cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs. This person can occasionally balance, stoop, kneel, crouch, and crawl. This person can occasionally reach overhead with the right upper extremity. Reaching is limited to frequently otherwise. This person can frequently handle, finger, and feel bilaterally. This person must avoid concentrated exposure to temperature extremes of hot and cold as well as wetness and humidity. This person must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. This person cannot perform any commercial driving. *** Based on your experience, education, and training, in your opinion, would [this person be able to perform Stevenson's past relevant work as a] registrar/data entry clerk job … as it's normally performed in the national economy, given those limitations?

(Tr. 53-54.) The VE testified that the hypothetical person would not be able to perform Stevenson's past work as a registrar/data entry clerk but would be able to perform other representative jobs in the economy at the light, unskilled level, such as sales attendant, housekeeper, and food service worker. (Tr. 54.)

---

[5] In a Work Summary submitted on December 30, 2019, the VE identified Stevenson's past relevant work as "registrar/data entry clerk" (sedentary, semi-skilled, SVP 4); substitute teacher (light, skilled, SVP 7); and tax preparer (sedentary, semi-skilled, SVP 4).  (Tr. 275.)

16

The ALJ then asked the VE a second hypothetical, as follows:

Second question. . . reduce lift, carry, push, pull to 10 pounds occasionally and 5 frequently.  Also reduce the ability to stand from six hours to two hours.  Leaving the other limitations intact, would there be a sedentary level job you could cite?

(Tr. 54-55.)  The VE testified that the hypothetical individual would not be able to perform any of Stevenson's past sedentary work but would be able to perform other sedentary, unskilled representative jobs in the economy, such as food and beverage order clerk, charge account clerk, and telephone clerk.  (Tr. 55.)

The ALJ then asked the VE a third hypothetical that was the same as the first but further restricted the hypothetical individual to occasional handling, fingering, and feeling.  (Tr. 56.)  The VE testified that the three, previously identified light exertional level jobs would not be available but that there were other light exertional level jobs that would satisfy this hypothetical.  (*Id.*)

The ALJ then asked the VE a fourth hypothetical that was the same as the second but further restricted the hypothetical individual to occasional handling, fingering, and feeling.  (*Id.*)  The VE testified that there were no sedentary level jobs that satisfied this hypothetical.  (*Id.*)

The ALJ then asked the VE to consider whether any jobs would exist if "because of pain and fatigue, an individual is going to be off task in the work setting 25 percent of the day, each and every day on an ongoing basis."  (*Id.*)  The VE testified that there would be no work for such an individual.  (Tr. 57.)  The VE further explained that "a person could go off task, on average, no more than 10 percent to maintain employment based on my training and experience."  (*Id.*)

The ALJ then asked the VE to consider whether any jobs would exist if, because of pain and fatigue, "the individual, in addition to the normal breaks and a normal lunch period would require two additional 15-minute breaks at unscheduled, unannounced times throughout the workday and that

[would] be each and every day." (Tr. 57.)  The VE testified that there would be no work for such an individual.  (*Id.*)

Finally, Stevenson's counsel asked the VE whether any jobs would exist if "the employee needed to either lay down or elevate their legs … to the waist level … around three times a day for 20 to 30 minutes." (Tr. 58.)  The VE testified that there would be no work for such an individual. (*Id.*)

### III.    Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).  A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Consideration of disability claims follows a five-step review process.  20 C.F.R. § 404.1520. First, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  Third, if the claimant is not performing substantial gainful activity, has a severe

impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Before considering step four, the ALJ must determine the claimant's residual functional capacity, i.e., the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his/her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

Here, Stevenson was insured on her alleged disability onset date, April 18, 2018, and remained insured through June 30, 2021, her date last insured ("DLI"). (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Stevenson must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

IV.    **Summary of Commissioner's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.    **The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.**

2.      The claimant has not engaged in substantial gainful activity since April 18, 2018, the alleged onset date (20 CFR 404.1571 et seq.).

3.      The claimant has the following severe impairments: right shoulder degenerative joint disease; right knee osteoarthritis status/post total knee arthroplasty; right hip osteoarthritis; right thumb Dequarvains; psoriatic osteoarthritis; anemia (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work[6] as defined in 20 CFR 404.1567(b) except: no climbing ladders, ropes or scaffolds; occasional ramps and stairs; occasional balance, stoop, kneel, crouch, crawl; occasional overhead reaching with the right upper extremity and frequent reaching otherwise; frequent handling, fingering and feeling bilaterally; avoid concentrated exposure to temperature extremes of hot, cold, also wetness and humidity; avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; no commercial driving.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on June ** 1970 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

---

[6] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 404.1567(b).

20

> supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).
>
> 11.      The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-23.)

## V.      Standard of Review

The Court's review of the Commissioner's decision to deny benefits is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 521 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal citation omitted)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where

21

the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 at * 6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted*, 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010).

## VI.  Analysis

In her sole assignment of error, Stevenson argues that the ALJ's determination that she can perform a reduced range of light work is unsupported by substantial evidence because he "relied on the stale opinions of the State Agency medical consultants and inserted his own lay medical opinion." (Doc. No. 16 at p. 13.)  Specifically, she maintains that the ALJ could not rely on the opinions of state agency physicians Drs. Green and Siddiqui because the record contains "substantial evidence" post-dating those opinions, including her (1) abnormal August 2019 EMG showing right median mononeuropathy, (2) September 2019 MRI showing mild spondylosis in her cervical spine, and (3) December 2019 bilateral knee x-rays showing osteopenic bones.  (*Id*. at p. 15.)  Stevenson argues that the ALJ was required to obtain a medical opinion in order to properly evaluate this "raw medical data."  (*Id*. at p. 16.)  Instead, Stevenson maintains, the ALJ improperly "went on to interpret the

complex raw medical data to reach a conclusion as to Plaintiff's functionality." (*Id*. at p. 16.) Stevenson argues that this error is not harmless, particularly in light of the fact that the jobs the ALJ found at Step 5 require "frequent[7] handling and fingering" which may be inconsistent with the abnormal findings in her August 2019 EMG. (*Id*. at pp. 16-17.)

In response, the Commissioner argues that remand is not required because "the ALJ thoughtfully considered the evidence of Plaintiff's impairments, including the medical findings of the state reviewing physicians, and also assessed the medical evidence dated after the reports of the state reviewing physicians." (Doc. No. 19 at p. 1.) The Commissioner notes that "there is necessarily always a time lapse between the issuance of the state agency opinions and the ALJ hearing and decision," and asserts that "as long as the record reflects that the ALJ considered the evidence coming into the record after the state agency opinions, there is no error in relying on" them. (*Id*. at p. 9.) The Commissioner argues that, here, the ALJ "plainly considered the entirety of the medical record since the time of the state agency opinions and discussed that evidence at length." (*Id*. at p. 11.) The Commissioner further asserts that the subsequent medical evidence "did not show a significant worsening of Plaintiff's symptoms or limitations, but rather was similar to evidence available before the state agency physicians" and, thus, the RFC is supported by substantial evidence. (*Id.*)

In the Sixth Circuit, it is well established that the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec*., 280 Fed. Appx. 456, 459 (6th Cir.2008) (citing 20 C.F.R. § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec*., 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather

---

[7] In Drs. Green's and Siddiqui's opinions, the term "frequently" is defined as "cumulatively more than 1/3/ up to 2/3 of an 8 hour workday."  (Tr. 92, 111.)

than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.") However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir.1983)).

In the case at bar, it is undisputed that Stevenson was represented by counsel at the hearing and, therefore, the ALJ had no heightened duty to develop the record. Relying on *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008) and *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), however, Stevenson argues the ALJ nonetheless erred in failing to obtain updated medical opinions because medical records post-dating the February and March 2019 opinions of Drs. Green and Siddiqui included "complex raw medical data" that the ALJ was not capable of evaluating without the opinion of a medical expert. (Doc. No. 16 at p. 14.)

In *Deskin*, the ALJ found the claimant suffered from the severe impairments of degenerative disc disease and fibromyalgia. *Deskin*, 605 F.Supp.2d at 909. None of Deskin's treating physicians provided a medical opinion, despite an extensive treatment history. *Id.* at 910. Rather, the sole medical opinion in the record was that prepared by a state agency reviewing physician. *Id.* The record before the ALJ, however, contained two years of medical records post-dating the state agency physician's opinion. *Id.* The ALJ did not order a consultative examination or have a medical expert

24

testify at the hearing and, instead, "proceeded to decide the case on his analysis of the medical records, giving only passing mention to [the state agency physician's] opinion." *Id*.

The court determined the RFC was not supported by substantial evidence "because of the absence from the administrative record of a proper medical opinion as to Deskin's work-related limitations." *Id*. at 910. The court explained as follows:

> While acknowledging that the ALJ has discretion on whether to order a consultative examination or call a medical expert at the hearing, nevertheless, bottom line, the ALJ's ultimate residual functional capacity finding must have the support of substantial evidence in the administrative record. Where the ALJ proceeds to make the residual functional capacity decision in the absence of a medical opinion as to functional capacity from any medical source, or, as here, with one made without the benefit of a review of a substantial amount of the claimant's medical records, there exists cause for concern that such substantial evidence may not exist.

*Id*. at 911 (footnotes omitted). The court then held as follows:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id*. at 912. Because the post-state agency physician opinion record before the ALJ in *Deskin* contained "extensive MRI findings of diffuse and substantial degenerative disc disease throughout Deskin's spine," the court found the ALJ erred in failing to obtain "the opinion of a medical source to assist in the translation of the raw medical data ... into functional limitations." *Id*. at 913.

*Deskin*, however, has been criticized by other judges within this District. *See Adams v. Colvin*, 2015 WL 4661512 (N.D. Ohio Aug. 5, 2015) (collecting cases). *See also Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222 at *2 (N.D. Ohio March 2, 2010); *Jackson v. Comm'r of Soc. Sec.*, 2014

WL 2442211 at * 6 (N.D. Ohio May 30, 2014); *Williams v. Astrue*, 2012 WL 3586962 at * 7 (N.D. Ohio Aug.20, 2012); *Strimpel v. Astrue*, 2012 WL 4060744 at * 9 (N.D. Ohio Sept. 14, 2012). Perhaps as a result, in *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the same court that authored *Deskin* clarified the scope of that case as follows:

> Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test. **It potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence**. The ALJ retains discretion to impose work-related limitations without a proper source opinion where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id*. at * 2 (footnotes omitted) (emphasis added).  Although *Deskin* is not binding, courts in this District have held that "*Deskin* and its progeny suffice to establish that 'in some circumstances, an ALJ *is* required to obtain a medical opinion in furtherance of his 20 C.F.R. § 404.1545(a)(3) responsibility to develop the record." *Reidenbach v. Comm'r of Soc. Sec.*, 2022 WL 3043060 at * 8 (N.D. Ohio Aug. 2, 2022) (quoting *Falkosky v. Comm'r of Soc. Sec.*, 2020 WL 5423967 at *6 (N.D. Ohio Sept. 10, 2020) (emphasis in original)).  *See also Jay V. v. Comm'r of the SSA*, 2022 WL 847258 at *3-4 (S.D. Ohio Mar. 22, 2022); *Gonzales v. Comm'r of Soc. Sec.*, 2022 WL 824145 at * 8-11 (N.D. Ohio Mar. 18, 2022).

To date, the Sixth Circuit has not specifically commented on *Deskin* or its progeny.  *See Reidenbach*, 2022 WL 3043060 at * 8 (most recently remarking on the lack of Sixth Circuit precedent addressing *Deskin* and/or *Kiszys*).  However, the Sixth Circuit has held generally that an ALJ may rely on the opinions of state agency physicians who did not have the opportunity to review later-submitted medical records if there is an indication that the ALJ considered such records before assigning weight to an opinion that is not based on the full record.  *See Blakley v. Comm'r of Soc.*

*Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (citing *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).  *See also Kepke v. Comm'r of Soc. Sec.,* 636 Fed. Appx. 625, 632 (6th Cir. 2016) (noting that "before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record.  In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.") (quoting *Blakley*, 582 F.3d at 409); *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after Dr. Starkey's assessment . . . and took into account any relevant changes in McGrew's condition."); *Spicer v. Comm'r of Soc. Sec.*, 651 Fed. Appx. 491, 493-494 (6th Cir. 2016) (affirming ALJ decision where "the ALJ recounted the medical evidence entered after Dr. Carr gave his opinion and explained why it gave greater weight to Dr. Carr's opinion despite it predating that evidence."); *Myland v.  Comm'r of Soc. Sec.*, 2017 WL 5632842 at * 2 (6th Cir. 2017) (finding that ALJ did not err in crediting opinion of state agency consultant because the opinion "was supported by the totality of the evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion.")

Here, the ALJ discussed, at some length, the medical evidence pre-dating the state agency physicians' opinions.  (Tr. 20-21.)  The ALJ's entire discussion of the medical evidence post-dating the state agency physicians' opinions, however, consists only of the following three sentences:

> [A]n evaluation conducted in July 2019 revealed that the claimant did not have inflammatory arthritis and the claimant reported that prescription Methotrexate improved her impairment (B14F/10).  Additional neurological/musculoskeletal findings include an EMG conducted of the right wrist in August 2019 showing right

median mononeuropathy and an MRI of the cervical spine conducted in September 2019 showing midline cervical spondylosis (B15F/20-21). While the claimant is a candidate for revision surgery on her right knee, she has not had additional surgery or other procedures on the knee.

(Tr. 21.)  The ALJ then evaluated the state agency physicians' opinions, in relevant part, as follows:

I have fully considered the medical opinions and prior administrative medical findings as follows: the State Agency concluded that the claimant could perform light exertional work with occasional pushing/pulling and operation of foot controls with the right lower extremity on an occasional basis; occasionally climb ramps and stairs; never climb ladders ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead on the right; frequent handling/fingering with the right hand; avoid concentrated exposure to extreme heat/cold, wetness, humidity; avoid all exposure to hazards including unprotected heights, hazards, and commercial driving (B2A/B4A). *** I find the State Agency's opinion persuasive and supported by the totality of the medical evidence. The residual functional capacity sufficiently accommodates the claimant's right wrist/finger tenosynovitis, her osteoarthritis and history of right knee replacement. The claimant would have reduced ability to use her right hand, arm and lower extremities for work activity, however not beyond the limitations determined in this case.

(*Id*.)  The ALJ's RFC assessment is consistent with the opinions of the state agency physicians.  (Tr. 19.)

For the following reasons, the Court finds that remand is required because the medical record contains a "critical body" of objective medical evidence that is neither accounted for by a medical opinion or sufficiently acknowledged or addressed by the ALJ.  The record reflects that approximately eight months of medical evidence (from May 21, 2019 to December 20, 2019) followed the final state agency review of Stevenson's medical records.  Although this is not as long a period of time as in *Deskin*,[8] the Court must also consider the nature and substance of the medical

---

[8] As noted *supra*, *Deskin* involved more than two years of medical evidence post-dating the state agency physicians' medical opinions.  Nonetheless, courts have remanded in instances where there is a smaller time period at issue when the medical evidence post-dating the state agency physicians' opinions includes "the type of medical evidence that requires a medical opinion" to enable the ALJ to make a disability decision.  *See, e.g.*, *Gonzales*, 2022 WL 824145 at * 9

evidence from that eight-month time period and "determine whether it was the type of medical evidence that required a medical opinion" to enable the administrative law judge to make the disability decision. *Gonzales*, 2022 WL 824145 at * 9. As discussed below, the Court finds that the medical record post-dating the state agency physicians' opinions in this case includes new, abnormal objective test results and examination findings relating to Stevenson's right wrist/thumb, left knee, and back, which require a medical opinion to interpret.

Specifically, with regard to Stevenson's right wrist/thumb condition, Stevenson underwent an EMG of her right upper extremity on August 23, 2019, which was abnormal and suggested right median mononeuropathy. (Tr. 922.) This is in contrast to her previous EMG from September 2017, which was normal. (Tr. 285, 307.) Stevenson's abnormal EMG result from August 2019 is suggestive of a worsening of her right wrist/thumb condition (despite her release surgery in October 2018) and is potentially consistent with her continued complaints in November 2019 of persistent pain, numbness, and tingling. (Tr. 919-921.) In the decision, the ALJ does acknowledge (summarily and in a single sentence) that "[a]dditional neurological/musculoskeletal findings include an EMG conducted of [Stevenson's] right wrist in August 2019 showing right median mononeuropathy." (Tr. 21.) However, the ALJ says nothing further about this abnormal test result or Stevenson's continued complaints of pain, numbness, and tingling. Notably, the ALJ does not address the fact that this abnormal EMG post-dates the state agency physicians' review or otherwise explain why he believed that this new abnormal test result did not warrant any additional functional limitations relating to her

_____

(remanding where seven months of objective medical evidence post-dated the final state agency review of claimant's medical records).

right wrist/thumb.  Thus, the Court cannot determine how or whether the ALJ evaluated this new test result in the absence of a medical opinion regarding the same.

Additionally, the ALJ does not address, in any respect, the medical evidence regarding Stevenson's *left* knee pain.  As noted *supra*, Stevenson underwent bilateral knee x-rays on July 10, 2019 and December 20, 2019, both of which reveal abnormal findings in the left knee.  (Tr. 787, 932.)  Specifically, the July 10, 2019 x-rays showed mild medial compartment narrowing of the left knee joint; faint left meniscal calcifications; small bilateral knee joint effusions; and "an ossicle anterior to the distal left patellar tendon which may represent enthesopathy."  (Tr. 787.)  The December 2019 "pre-operative" bilateral knee x-rays showed mild medial compartment narrowing of the left knee, and "osteopenic bones."  (Tr. 932.)  In addition, treatment notes from August, September, and October 2019 include some relevant abnormal examination findings including antalgic gait and tenderness, effusion, and crepitation in Stevenson's left knee.  (Tr. 878-879, 898-899, 914.)  All of the above medical records relating to Stevenson's left knee post-date the state agency physicians' opinions.  The ALJ does not acknowledge any of these records in his decision.  Nor does he otherwise discuss Stevenson's left knee and/or evaluate the potential need for additional functional limitations relating thereto.  Lastly, while the ALJ acknowledges the fact that Stevenson underwent an MRI of her cervical spine in September 2019 that showed "midline cervical spondylosis" (Tr. 21), he does not include any further discussion of this test result.  And, again, the ALJ does not discuss whether he considered and/or evaluated the potential need for additional functional limitations relating to Stevenson's cervical spine.

The ALJ's failure to sufficiently acknowledge or address the above evidence makes it difficult for this Court to determine whether he, in fact, considered it and accounted for any relevant changes

in Stevenson's condition post-dating the state agency physicians' opinions. Nor is it even entirely clear that the ALJ recognized that the above evidence did, in fact, post-date the state agency physicians' opinions. The ALJ's scant discussion of the medical evidence post-dating Dr. Green's and Dr. Siddiqui's opinions impedes this Court's review as it "does not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet*, 78 F.3d at 307). *See also Shrader*, 2012 WL 5383120 at * 6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

Moreover, this is not a case that fits into the exception carved out in *Kiszys*, *supra*, i.e., "where the medical evidence shows 'relatively little physical impairment' and an ALJ 'can render a commonsense judgment about functional capacity.'" *Kizys*, 2011 WL 5024866 at * 2. To the contrary, the body of evidence indicates that, despite having right wrist release surgery, Stevenson continued to experience significant pain, numbness, and tingling in her right hand and fingers, consistent with the abnormal August 2019 EMG results. Additionally, the x-rays of her left knee revealed abnormal findings, and treatment records reflect that Stevenson complained of significant pain and limitations in her ability to engage in minimal daily activity due to her bilateral knee pain.

Further, to the extent the ALJ considered the medical evidence post-dating the state agency physicians' opinions, the Court agrees with Stevenson that he was not qualified to interpret it and translate it into functional limitations in the absence of a medical opinion. (Doc. No. 20 at pp. 2-3.) To the contrary, it is well established that courts and ALJs are "generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data." *Alexander v. Kijakazi*, 2021 WL 4459700 at * 9 (N.D. Ohio Sept. 29, 2021) (collecting cases). *See also Fergus v. Comm'r of Soc. Sec.*, 2022 WL 743487 at * 11 (N.D.

Ohio March 11, 2022) (same); *Mascaro v. Colvin*, 2016 WL 7383796 at * 11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor the court had the medical expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition), *report and recommendation adopted*, 2016 WL 7368676 (N.D. Ohio Dec. 20, 2016); *Nofsinger v. Comm'r of Soc. Sec.*, 2010 WL 2651600 at *2 (W.D. Mich. July 1, 2010) ("Limitations are the expertise of medical providers and outside the expertise of both this Court and ALJs.").

In sum, while Stevenson's test results, diagnostic imaging and treatment records "may appear minimal to the lay person, the ALJ was not qualified to translate this medical data into functional capacity determinations." *Mabra v. Comm'r of Soc. Sec.*, 2012 WL 2319245 at *9 (S.D. Ohio June 19, 2012), *report and recommendation adopted*, 2012 WL 3600127 (S.D. Ohio Aug. 21, 2012). Thus, faced with a critical body of objective medical evidence involving Stevenson's impairments, and without the aid of a medical opinion regarding that evidence, the ALJ was obligated to further develop a complete record by ordering additional opinion evidence. Specifically, the ALJ "could have solicited the opinion of a medical expert, ordered an additional consultative exam, or sent the [test results], [imaging] records, and other records back to the state agency reviewing physician[s] for an updated assessment. However, no such steps were taken." *Gentry v. Comm'r of Soc. Sec.*, 2018 WL 4305213, at *5 (N.D. Ohio Sept. 10, 2018) (internal citations and quotations omitted). Instead, the ALJ appears to have either failed to fully consider the evidence post-dating the state agency physicians' opinions and/or based Stevenson's RFC on his own interpretation of the raw medical data. *Id*.

As a result, the Court finds that the ALJ's RFC determination is not supported by substantial evidence. *See Deborah Kaye F. v. Comm'r of Soc. Sec. Admin.*, 2022 WL 847257 at *3 (S.D. Ohio

Mar. 22, 2022) (remanding claim where the two medical sources did not review later medical evidence, which contained a critical body of objective medical evidence involving plaintiff's severe impairments, despite the ALJ having mentioned this additional evidence in the decision); *see also Banks v. Comm'r of Soc. Sec.*, 2020 WL 5757173 at *3 (S.D. Ohio Sept. 28, 2020) (remanding claim when none of the medical sources reviewed two MRI reports suggesting a worsening of the plaintiff's condition.); *Bryant v. Comm'r of Soc. Sec.*, 2017 WL 489746, at *4 (S.D. Ohio Feb. 7, 2017), *report and recommendation adopted sub nom. Bryant v. Berryhill*, 2017 WL 713564 (S.D. Ohio Feb. 22, 2017).  Accordingly, and for all the reasons set forth above, the Court finds that further development of the record is necessary.

## VII.    Conclusion

For all of the foregoing reasons, the Court finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and this matter is REMANDED to the Commissioner pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Opinion.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  September 29, 2022            U. S. DISTRICT JUDGE